**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

WANDA H.,[1]
      Plaintiff,

             v.                                  Civil No. 3:22-cv-00539 (DJN)

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,
      Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits and supplemental security income under the Social Security Act ("Act"). At the time of her application, Plaintiff was forty-five years old and previously worked as a sewing machine operator. (R. at 52, 129, 139.) Plaintiff alleges she is unable to work due to: (1) schizoaffective personality disorder; (2) major depressive disorder; (3) generalized anxiety disorder; (4) post-traumatic stress disorder ("PTSD"); (5) degenerative disc disease of the lumbar spine; (6) obstructive sleep apnea; (7) dyspnea on exertion; (8) hypertension; (9) chest pain; (10) muscle spasms; (11) migraines; (12) poor attention and memory; (13) suicidal ideation; (14) an inability to tolerate large crowds; and (15) obesity. (R. at 129.) (*See also* Pl.'s Mem. Supp. Summ. J. at 2, ECF No. 15 ("Pl.'s Mem."))

On June 15, 2018, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. The ALJ's decision was subsequently remanded by this Court on

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

December 9, 2019. (R. at 1234-55.) Another ALJ then issued a subsequent decision on March 15, 2022, again finding that Plaintiff was not disabled. (R. at 1141-1159.) This matter now comes to the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

Plaintiff seeks review of the ALJ's decision, arguing that the ALJ's decision is not supported by substantial evidence. For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 13) and Motion to Remand (ECF No. 14) be DENIED, that Defendant's Motion for Summary Judgment (Def.'s Mot. Summ. J., ECF No. 18 ("Def.'s Mem.")) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and supplemental security income on April 16, 2013 and April 23, 2013, respectively, alleging disability beginning March 3, 2013. (R. at 129, 142, 391 (amending alleged onset date of disability).) The Social Security Administration ("SSA") denied Plaintiff's claims on September 20, 2013, and again upon reconsideration on June 11, 2014. (R. at 155-56, 193-94.) An ALJ issued a written opinion on June 20, 2018, holding that Plaintiff was not disabled under the Act. (R. at 16-33.) The SSA Appeals Council denied Plaintiff's request to review the ALJ's decision, then Plaintiff sought judicial review from this Court pursuant to 42 U.S.C. § 405(g). (R. at 1.) On December 19, 2019, this Court

---

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

remanded the Commissioner's decision because it found that the ALJ insufficiently explained why she discounted the medical opinion of Plaintiff's treating physician and improperly relied solely on objective evidence when assessing Plaintiff's subjective complaints. (R. at 1246, 1251.)

On remand, Plaintiff requested an administrative hearing, which was held on February 15, 2022. (R. at 1170-1209.) Another ALJ then issued a written opinion on March 15, 2022, holding that Plaintiff was not disabled under the Act. (R. at 1144-59.) Plaintiff requested review of this decision, but was denied on July 26, 2022, rendering the ALJ's decision final. (R. at 1134-37.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g) and 1383(c).[3]

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

---

[3] 42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for supplemental security income.

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. *Id.* §§ 404.1545(a), 416.925(a).

4

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. 20 C.F.R §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 1144-59.) *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 3, 2013, the alleged onset date. (R. at 1146.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "degenerative disc disease of the lumbar spine; hypertension; obstructive sleep apnea; obesity; major depressive disorder; generalized anxiety disorder; personality disorder not otherwise specified; [PTSD]; and alcohol use disorder (20 CFR 404.1520(c) and 416.920(c))." (R. at 1147.) At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1148.)

The ALJ then determined Plaintiff's residual functional capacity. (R. at 1150.) Based on the evidence in the record, the ALJ determined that Plaintiff retained the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations:

> [Plaintiff] can understand, remember, and carry out short, simple instructions in performing simple, unskilled work . . . where such work does not involve a strict quota system or a machine setting the pace of work while maintaining sufficient attention, concentration, persistence, and pace to perform all such tasks within all requirements of time, quality, and quantity. She can occasionally work in coordination with or proximity to others. She can make simple work-related decisions. She can interact occasionally with the public, supervisors, and coworkers. She can ask simple questions or request assistance.

(R. at 1150.) The ALJ explained that she determined Plaintiff's residual functional capacity after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including medical opinion evidence, based on the regulatory requirements. (R. at 1150-51.)

The ALJ subsequently concluded at step four that Plaintiff could not perform past relevant work as a sewing machine operator. (R. at 1158.) She explained that such work was classified as skilled work performed at the medium exertion level, which was greater than Plaintiff's residual functional capacity. (R. at 1158.) However, at step five, the ALJ found that there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 1158.) The ALJ considered the testimony of a vocational expert, who opined that Plaintiff could perform the requirements of merchandise marker, routing clerk, and housekeeper. (R. at 1159.) Therefore, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 1159.)

## IV. ANALYSIS

Plaintiff argues that this Court should either order the Commissioner to award benefits or remand the case for further evaluation because of multiple errors in the ALJ's residual functional

6

capacity assessment. (Pl.'s Mem. at 12-27.) First, Plaintiff argues that the ALJ failed to present the "persuasive contrary evidence" required to reject the medical opinion submitted by Plaintiff's treating psychiatrist, Noman Shamim, M.D. ("Dr. Shamim") pursuant to the regulations governing medical opinion evidence for claims filed prior to March 27, 2017. (Pl.'s Mem. at 12, 17.) Second, Plaintiff alleges that the ALJ erred by not accounting for Plaintiff's "back pain, shortness of breath, hip pain, and obesity, either singly or in combination[,]" in the residual functional capacity assessment. (Pl.'s Mem. at 18.) Third, Plaintiff claims that the ALJ erred by failing to account for Plaintiff's need for a cane. (Pl.'s Mem. at 26.)

Defendant responds that the ALJ did not err in her residual functional capacity assessment and substantial evidence supports her findings. (Def.'s Mem. at 1, 16.) Specifically, Defendant claims that the ALJ did not err when she gave little weight to Dr. Shamim's opinion because the ALJ properly explained that this opinion was inconsistent with other evidence in the record. (Def.'s Mem. at 20-21.) Second, Defendant argues the ALJ pointed to objective medical record evidence, medical opinions, Plaintiff's response to treatment, and Plaintiff's statements about her activities when evaluating Plaintiff's allegations of back and hip pain, shortness of breath, and obesity. (Def.'s Mem. at 22-28.) Further, Defendant claims that it was reasonable for the ALJ to exclude Plaintiff's need for a cane since: (1) substantial evidence shows that Plaintiff could perform work at the light level; and (2) Plaintiff failed to show that a cane was medically necessary pursuant to the relevant regulations. (Def.'s Mem. at 24, 29-30.)

For the reasons that follow, the Court finds that the ALJ did not err in her residual functional capacity analysis, and substantial evidence supports her findings.

**A.  The ALJ Did Not Err When She Evaluated Dr. Shamim's Medical Opinion.**

Plaintiff alleges that the ALJ erred in assessing Dr. Shamim's opinion as a treating

physician pursuant to the regulations governing medical opinion evidence for claims filed prior to March 27, 2017. (Pl.'s Mem. at 12.) Specifically, Plaintiff claims that the ALJ: (1) did not explain why Plaintiff's attention and concentration are not as limited as Dr. Shamim found; (2) either disingenuously or erroneously assessed Dr. Shamim's assessment of Plaintiff's ability to interact with others and complete detailed tasks; (3) failed to explain how Plaintiff's ability to drive short distances and attend and participate in regular appointments demonstrates that Plaintiff can adhere to an ordinary routine or set realistic goals; and (4) failed to cite specific evidence and selectively chose evidence to support her conclusion that Plaintiff displayed normal attention and concentration. (Pl.'s Mem. at 12-17.)

Defendant claims that the ALJ appropriately explained why she afforded Dr. Shamim's medical opinion little weight because it was inconsistent with the record evidence. (Def.'s Mem. at 20.) In response to Plaintiff's contentions, Defendant alleges that the ALJ: (1) provided a "specific discussion of the evidence that supported assessing different limitations than proposed by Dr. Shamim[,]"; (2) was not disingenuous when she limited Plaintiff to "short, simple instructions in performing simple, unskilled work"; (3) reasonably inferred from the medical opinions, medical records, and Plaintiff's testimony that Plaintiff could adhere to a routine and set realistic goals; and (4) appropriately assessed the objective medical evidence, which largely failed to describe deficits in Plaintiff's attention, concentration, or memory. (Def.'s Mem. at 21-24.)

1. *Legal Standard for Evaluating Medical Opinion Evidence.*

When evaluating whether a claimant has a medically determinable impairment, or combination of impairments, that would significantly limit the claimant's ability to do basic work activities, an ALJ must analyze the claimant's medical records and any medical evidence resulting from consultative examinations or medical expert evaluations. 20 C.F.R. §§ 404.1512, 404.1527,

416.912, 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners, or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *Id.* §§ 404.1527(c), 416.927(c). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. *Id.* §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-3p.[4] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. *Id.* §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants, or therapists. SSR 06-03p; 20 C.F.R. §§ 404.1527(f), 416.927(f).[5] Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir.

---

[4] Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f). 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her claims on April 16, 2013 and April 23, 2013, before this regulation took effect. (R. at 129, 142.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim(s).

[5] The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1527(f) and 416.927(f). The given examples are a non-exhaustive list. SSR 06-03p.

2017); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence, or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. *Id.* §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

2. *Dr. Shamim's Medical Opinion.*

Dr. Shamim completed a mental residual functional capacity statement on March 21, 2016, in which he evaluated Plaintiff's ability to perform work-related activities. (R. at 968-71.) The statement included a list of mental abilities that Dr. Shamim rated as Category I, Category II, Category III, or Category IV based on his evaluation. (R. at 968-69.) A mental ability classified as Category I is an ability that "does not preclude performance of any aspect of the job," whereas Categories II, III, and IV mental abilities preclude performance for 5%, 10%, or 15% of an eight-hour workday, respectively. (R. at 968.) Dr. Shamim checked Category I or Category II for half of the listed mental abilities. (R. at 969-70.) In two of these areas, "respond appropriately to changes in the work setting" and "set realistic goals or make plans independently of others," Dr. Shamim checked both Category II and Category III, indicating that he estimated Plaintiff's limitations would preclude performance for either 5% or 10% of the workday. (R. at 970.)

Dr. Shamim identified eight of the twenty abilities as Category III or Category IV. (R. at 969-70.) Of these, Dr. Shamim assessed Plaintiff with Category III mental limitations in the following areas of mental functioning: ability to "accept instructions and respond appropriately to criticism from supervisors," "maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness," and "set realistic goals or make plans independently of others." (R. at 969-70.) He then assessed Plaintiff with Category IV mental limitations in her ability to "maintain attention and concentration for extended periods of time," "perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances," and "sustain an ordinary routine without special supervision." (R. at 969.)

Dr. Shamim concluded that Plaintiff's limitations would preclude her from performing a job 20% of the time, result in four or more absences per month, and would cause her to work 50%

less efficiently compared to the average worker. (R. at 970.) Dr. Shamim added that "[Plaintiff] is mentally unstable at times and needs to be on med[ication] for stability and cannot hold a job on [a] regular basis." (R. at 971.)

3.   *The ALJ's Analysis of Dr. Shamim's Opinion.*

In her discussion of Plaintiff's mental impairments, the ALJ summarized Dr. Shamim's opinion as Plaintiff's treating psychiatrist and explained that his responses to the mental residual functional capacity statement were "not entirely consistent with the evidence as a whole." (R. at 1156.) The ALJ explained that the evidence "establish[ed] that [Plaintiff was] not as limited in maintaining attention and concentration, adhering to a schedule, making simple decisions, asking simple questions, or responding to changes as Dr. Shamim [found]." (R. at 1156.)

Regarding Plaintiff's ability to maintain attention and concentration, the ALJ evaluated Plaintiff's subjective complaints and treatment history. (R. at 1152-56.) She determined that Plaintiff "consistently display[ed] good attention and concentration during appointments, and clinicians have not indicated that she is easily distracted, implying that she can remain on task for simple work activities without restriction." (R. at 1157.) Although Plaintiff did "present with psychomotor slowing" on one occasion, the ALJ noted that "other than [that occasion], her motor activity has remained normal." (R. at 1157.) The ALJ acknowledged that Plaintiff's primary care physician prescribed medication to address Plaintiff's difficulty concentrating, depression, and worrying. (R. at 1152.) The ALJ also noted how Plaintiff occasionally exhibited "intermittent eye contact . . . and deficits in attention, concentration, and memory" during formal mental health treatment. (R. 1152-53.) Further, Plaintiff "describe[d] ongoing symptoms," and examinations often noted irregularities in her mood, affect, insight, and judgement. (R. at 1153.)

Nonetheless, the ALJ found that "otherwise, evaluations [were] largely normal, with clinicians failing to describe deficits in [Plaintiff's] attention, concentration, or memory . . . ." (R. at 1153.) Moreover, the ALJ noted that, "even when [Plaintiff] complain[ed] of increase[d] symptoms because of stress, "examinations remain[ed] largely unchanged." (R. at 1154.) She added that Plaintiff "[did] not always take her medications as prescribed, and [told] providers that when she [did] take her medications, her symptoms improve[d]." (R. at 1153.) Indeed, the ALJ cited instances when Plaintiff was hospitalized, but later improved after taking her medications. (R. at 1153.) Although Plaintiff complained that her medications made her drowsy, the ALJ concluded that this was "not as problematic as [Plaintiff] allege[d]" since "[Plaintiff] ha[d] not discussed this side effect with her treatment providers." (R. at 1154.)

Further, the ALJ noted that "[Plaintiff] ha[d] not demonstrated difficulties sustaining an ordinary routine, setting realistic goals, being aware of hazards, or traveling in unfamiliar places." (R. at 1157.) She explained that Plaintiff's ability:

> [T]o drive short distances[6] and attend and participate in regular medical appointments . . . suggest[ed] that she [could] travel independently, navigate hazards safely, adhere to an ordinary routine, set realistic goals, and attend work without an unreasonable number of absences or incomplete days, and that she is capable of performing these activities in the workplace.

(R. at 1157.) Moreover, the ALJ found that, "despite her complaints, [Plaintiff] is able to care for

---

[6] Although Plaintiff alleges that the ALJ mischaracterized Plaintiff's ability to drive by overlooking that Plaintiff did so only occasionally, Plaintiff fails to cite evidence that her inability to attend medical appointments due to transportation difficulties was a result of her mental impairments. (Pl.'s Mem. at 14.) Indeed, as Defendant notes, many of Plaintiff's medical records evince that Plaintiff relied on others for transportation, as she did not own a car. (Def.'s Mem. at 22, 23, citing R. at 78 (Plaintiff's testimony that she did not own a car), 1037, 1124, 1438, 1442, 1509 (medical records documenting Plaintiff's transportation issues).) Consequently, the undersigned finds that the ALJ did not mischaracterize the evidence related to Plaintiff's ability to drive.

her personal needs, prepare simple meals, drive, shop, manage her own funds, and handle her own medical care." (R. at 1154.) Considering this, Plaintiff's normal motor activity, and her "good cognitive functioning," the ALJ concluded that Plaintiff could "perform work activities efficiently." (R. at 1157.)

Nonetheless, the ALJ considered Plaintiff's complaints that she had "trouble remembering information, handing [sic] stress, [] following instructions, [feeling] uncomfortable in groups, and [being able to] sustain attention for just a few minutes at a time." (R. at 1153.) She concluded that Plaintiff's mental impairments precluded Plaintiff from "performing complex, fast-paced work activities, and further affect[ed] her abilities to interact with others and make decisions." (R. at 1152.) However, the ALJ noted that Plaintiff's "mental status examinations [were] usually unremarkable" and that, "even when [Plaintiff] complain[ed] of increase[d] symptoms because of stress, examinations remain[ed] largely unchanged." (R. at 1154.) The ALJ explained that treatment providers found Plaintiff to be "cooperative" or "friendly" during appointments and "ha[d] not described difficulties interacting with [Plaintiff]." (R. at 1155.) In addition, the ALJ noted that "[Plaintiff] is able to shop and spend time with family, and these activities both require her to demonstrate appropriate social skills." (R. at 1155-56.) According to the ALJ, "this implie[d] that [Plaintiff] is capable of interacting with supervisors, coworkers, and the public at least occasionally, and of asking simple questions and requesting assistance if necessary." (R. at 1156.) Finally, the ALJ concluded that Plaintiff could adjust to changes in the workplace because there were instances when "clinicians ha[d] not observed an objective increase in [Plaintiff's] mental status abnormalities during periods of increased stress or change." (R. at 1155.) Despite this, the ALJ opined that Plaintiff "should not be required to perform tasks involving more than simple-work related decisions." (R. at 1155.)

14

In addition to the medical treatment record and Plaintiff's subjective complaints, the ALJ also considered the medical opinion evidence from two state agency psychologists, Louis Perrott, Ph.D. ("Dr. Perrott") and Joseph Leizer, Ph.D. ("Dr. Leizer") (R. at 1155-56.) Dr. Perrott found, in part, that Plaintiff "[could] follow simple directions and complete simple tasks," but she "ha[d] moderate difficulties interacting with supervisors, coworkers, and the public." (R. at 1155.) Additionally, he determined that Plaintiff "c[ould] engage in routine, low-stress competitive work." (R. at. 1155.)  The ALJ gave Dr. Perrott's opinion "some weight" after determining that it was "generally consistent with the evidence and is adequately supported by an explanation." (R. at 1156.) In support, the ALJ explained that "providers typically fail[ed] to describe deficits in [Plaintiff's] attention, concentration, or memory" and Plaintiff's testimony indicated that "she is able to prepare simple meals, drive, shop, manage her own funds, and handle her own medical care." (R. at 1155.) The ALJ explained that such activities require "some degree of attention and concentration" because they "require [Plaintiff] to follow instructions or procedures, remain on task, work at an appropriate pace, [and] remember information[.]" (R. at 1155.) However, the ALJ determined that Plaintiff's conditions "prevent[ed] her from performing complex, fast-paced work activities, as Dr. Perrott [found]." (R. at 1155.) Accordingly, the ALJ found that "[Plaintiff] is capable of performing simple work activities" but not work which requires "a strict quota system or a machine setting the pace of work." (R. at 1155.)

Next, the ALJ considered the opinion of Dr. Leizer. (R. at 1156.) The ALJ concluded that Dr. Leizer's finding that Plaintiff "has moderate limitations in understanding and remembering detailed instructions, carrying out detailed instructions . . . working in coordination with others, completing a normal workday and workweek, and interacting with the public and coworkers," was "partially consistent with the evidence." (R. at 1156.) In support, the ALJ cited the previously

evaluated evidence that indicated Plaintiff had the "limited ability to perform detailed tasks and interact with others in the workplace." (R. at 1156.) Further, the ALJ cited to medical records and concluded that "[Plaintiff] is able to attend medical appointments without an unreasonable number of absences . . ." According to the ALJ, "this implie[d] that [Plaintiff] can . . . complete a normal workday and workweek without restriction." (R. at 1156.) The ALJ explained that "clinicians routinely fail[ed] to describe deficits in [Plaintiff's] attention or concentration on examination," which "impl[ied] that [Plaintiff] can sustain attention and concentration for simple tasks . . . ." (R. at 1156.) Although the ALJ found that Dr. Leizer properly reviewed the evidence and offered an explanation "based on that review," the ALJ nonetheless assigned "little weight" to the opinion, after finding that it was "vague, and [did] not discuss exactly what [Plaintiff] can do in spite of her limitations." (R. at 1156.)

Though Plaintiff alleges it is unclear what evidence the ALJ referenced when she evaluated Dr. Shamim's opinion, the Court can readily deduce that the ALJ cited to the preceding pages discussing Plaintiff's subjective complaints, treatment history, and medical opinions, which informed the ALJ's conclusion that Plaintiff's ability to maintain attention and concentration was not as limited as Dr. Shamim found. (Pl.'s Mem. at 12-13) (arguing that "the ALJ leaves us in the dark as to what prior explanation she was referring to by the expression 'As explained above.' As of this point in the ALJ's decision, there was no prior explanation as to why Dr. Shamim's opinions should be rejected.") Further, the ALJ was neither "disingenuous" or "erroneous" when she concluded Plaintiff was more limited in some respects than Dr. Shamim assessed. (Pl.'s Mem. at 12-13) (arguing that a more severe categorization of Plaintiff's ability to interact with others and complete detailed tasks should have rendered a more restrictive residual functional capacity finding.) While the ALJ explained that Dr. Shamim overstated Plaintiff's abilities and understated

others, the undersigned finds that the record, as a whole, contains substantial evidence supporting the ALJ's findings in these mental functioning areas, and that the ALJ's assessment of Dr. Shamim's opinion regarding Plaintiff's limitations provides support for the ALJ's decision not to afford this opinion controlling weight.

Accordingly, the undersigned finds that the ALJ sufficiently cited "persuasive contrary evidence" when she explained how Dr. Shamim's medical opinion was not consistent with the evidence as a whole. *See Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). There is no indication that the ALJ impermissibly "dredged up 'specious inconsistencies'" in her evaluation, nor did the ALJ fail to give sufficient reason for the weight afforded. *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Accordingly, the Court finds that substantial evidence supports the ALJ's findings.

**B. The ALJ Appropriately Considered Plaintiff's Subjective Complaints in Her Residual Functional Capacity Assessment.**

Plaintiff also contends that the ALJ's residual functional capacity assessment failed to consider Plaintiff's subjective complaints of back and hip pain, shortness of breath, and obesity. (Pl.'s Mem. at 18.) In response, Defendant asserts that the ALJ's assessment is supported by findings that: (1) Plaintiff's asthma was not severe; (2) Plaintiff did not have a medically determinable cardiac impairment; and (3) the evidence did not prove that Plaintiff's back and hip pain would preclude her from performing work at the light exertional level. (Def.'s Mem. at 24-27.)

*1. Legal Standard.*

When evaluating a claimant's symptoms, an ALJ must follow a two-step evaluation process. SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *2 (Mar. 16, 2016); 20 C.F.R. § 404.1529. The ALJ must first "consider whether there is an underlying medically determinable

physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms." 2016 SSR LEXIS 4 at *3, [WL] at *2. At this step, the ALJ considers whether objective medical evidence exists to support the conclusion that an impairment exists. *Id.*

Next, at step two, after finding a medically determinable impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* In evaluating the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ is not required to find objective medical evidence to find that a claimant is disabled because "symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." 2016 SSR LEXIS 4, at *11, 2016 WL 1119029, at *4. The claimant is not required to present objective evidence at this step. *Id*. In sum, the two-step process requires the ALJ to consider the entire case record, and she must "not disregard [a claimant's] statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. *Arakas v. Comm'r, Soc. Sec. Admin*, 983 F.3d 83, 95 (4th Cir. 2020) (alteration in original) (citations omitted). Finally, the ALJ's decision must: (1) contain specific reasons for the weight given to the individual's symptoms; and (2) be consistent with and supported by the evidence. 2016 SSR LEXIS 4, at *26, 2016 WL 1119029, at *9.

   2. *Substantial Evidence Supports the ALJ's Finding that Plaintiff's Dyspnea[7] is a Non-Severe Impairment.*

Plaintiff argues that the ALJ committed reversible error when she "completely ignore[d]

---

[7] "Dyspnea, also called shortness of breath, is a patient's perceived difficulty to breathe . . . . Dyspnea on exertion is a similar sensation; however, this shortness of breath is present with exercise and improves with rest." Sandeep Sharma, *et al*., *Dyspnea on Exertion*, Nat'l Ctr. for Biotechnology Info., U.S. Nat'l Libr. of Med. (last updated May 8, 2023), https://www.ncbi.nlm.nih.gov/books/NBK499847/.

[Plaintiff's] shortness of breath or [dyspnea on exertion]" and that, "[g]iven the overwhelming evidence that [Plaintiff] experienced constant dyspnea on exertion, it is inconceivable that [Plaintiff] can perform light work . . . ." (Pl.'s Mem. at 23-24.) In support, Plaintiff points to medical treatment records that document instances in which she complained of shortness of breath and dyspnea on exertion. (Pl.'s Mem. at 23.) She contends that her "shortness of breath was in the context of her continual obesity" which "often exceeded or virtually equaled *38.00*." (Pl.'s Mem. at 23) (emphasis in original.) Plaintiff cites to caselaw outside the Fourth Circuit which found reversible error when an ALJ failed to account for a claimant's shortness of breath and argues that *Arakas v. Commissioner* and *Lewis v. Berryhill* recently guided a Western District of North Carolina's disposition in a similar way. (Pl.'s Mem. at 24-25.)

Defendant responds that substantial evidence in the record supports the ALJ's finding that Plaintiff's dyspnea "did not 'more than minimally affect [Plaintiff's] ability to perform work activities." (Def.'s Mem. at 25, citing R. at 1147.) Defendant notes that the ALJ explained how Plaintiff "described her shortness of breath symptoms as 'at most annoying', treated with a nebulizer," and "presented with 'few abnormalities' in her pulmonary system in examinations." (Def.'s Mem. at 25, citing R. at 1147.) According to Defendant, Plaintiff failed to "press an allegation that shortness of breath meaningfully hindered her ability to work before the ALJ" as her counsel explained during the hearing that "this was a 'mental case.'" (Def.'s Mem. at 25, citing R. at 1179.) Defendant then cites to medical treatment notes indicating Plaintiff either denying dyspnea or shortness of breath. (Def.'s Mem. at 26.)

Substantial evidence supports the ALJ's determination that Plaintiff's dyspnea is a non-severe impairment. Noting Plaintiff's severe and non-severe impairments, the ALJ acknowledged that Plaintiff had a "long history of asthma" for which she "required little treatment . . but on a few

occasions, examinations have revealed diminished breath sounds or expiratory wheezing." (R. at 1147.) The ALJ reviewed Plaintiff's medical records from when Plaintiff "sought emergency care for shortness of breath" and noted that "[a]lthough an examination was unremarkable, she was provided with nebulized medication." (R. at 1147.) Accordingly, the ALJ concluded that "[o]verall, the evidence, including the few abnormalities present in [Plaintiff]'s lungs and the minimal treatment she has required for her asthma, suggests that this condition does not more than minimally affect her ability to perform work activities." (R. at 1147.)

Further, the ALJ noted that Plaintiff had difficulty breathing while sleeping, was diagnosed with obstructive sleep apnea,[8] and continued to experience apneic episodes even when using an airway pressure machine while sleeping. (R. at 1152.) The ALJ then explained that this was "a factor in her exertional restrictions, and also play[ed] a role in her mental limitations . . . ." (R. at 1152.) Likewise, the ALJ noted that Plaintiff's obesity, which was "above [a BMI of] 30 . . . exacerbate[d] her physical impairments and thus contribute[d] to her limitation to light work." (R. at 1152.) Overall, the ALJ concluded that she considered Plaintiff's "obstructive sleep apnea [and] obesity" when assessing "limitations consistent with the weight of the medical evidence as discussed above." (R. at 1158.)

In addition to these records, the ALJ also "consider[ed] other evidence in the record to determine if [Plaintiff's] symptoms limit[ed] [her] ability to do work-related activities." (R. at 1151.) The ALJ explained that Plaintiff could "care for her personal needs, prepare simple meals,

---

[8] "Obstructive sleep apnea (OSA) is characterized by episodes of a complete (apnea) or partial collapse (hypopnea) of the upper airway with an associated decrease in oxygen saturation or arousal from sleep. This disturbance results in fragmented, nonrestorative sleep." Jennifer M. Slowik, *et al.*, *Obstructive Sleep Apnea*, Nat'l Ctr. for Biotechnology Info., U.S. Nat'l Libr. of Med. (last updated Dec. 11, 2022), https://www. https://www.ncbi.nlm.nih.gov/books/NBK459252/.

and do some chores around the house, like making the bed and doing the laundry." (R. at 1151.)
The ALJ also considered the medical opinion evidence from Richard Surrusco, M.D. ("Dr.
Surrusco"), who opined that Plaintiff could stand and walk for about six hours in an eight-hour
day, sit for about six hours, lift and carry twenty pounds occasionally and ten pounds frequently.
(R. at 1154.) The ALJ found Dr. Surrusco's opinion overall "consistent with the evidence." (R. at
1154.) Among other reasons, the ALJ reasoned that "while [Plaintiff] continue[d] to experience
apneic events,   treatment providers have not stated that she seem[ed] fatigued during
appointments[,]" which "implie[d] that she [was] not more limited in lifting or carrying than Dr.
Surrusco [found] her to be." (R. at 1154.) The ALJ also considered the opinion submitted by state
agency reviewing physician, Carolina Bacani-Longa, M.D. ("Dr. Bacani-Longa"), who agreed
with Dr. Surrusco's findings regarding Plaintiff's ability to stand, walk, and sit. (R. at 1155.)
Though Dr. Bacani-Longa assessed Plaintiff with the ability to perform medium level work, the
ALJ found this level of restriction to be "not entirely consistent with the evidence" and
subsequently restricted Plaintiff to light level work. (R. at 169-70, 187-88, 1155.)

   A review of the record reflects that Plaintiff managed to treat her dyspnea and asthma with
medication and rarely sought subsequent emergency care for shortness of breath after being
prescribed medication. (R. at 974, 986, 1101-02, 1110, 1414, 1420, 1423, 1462.) Indeed, Plaintiff
"maintain[ed] normal [oxygen] saturation during ambulation" on examination, and her cardiac
workups generally showed normal cardiac functioning. (R. at 1423, 1956, 1960-67.) Although
Plaintiff sought emergency care for shortness of breath and occasionally complained of difficulty
breathing to medical providers, she also denied shortness of breath in medical appointments in
2019, 2020, and 2021. (R. at 1377-78, 1436, 1444, 1452, 1460, 1462, 1480, 1489, 1537.)

Upon review, the undersigned finds that the ALJ appropriately considered Plaintiff's asthma and dyspnea, including her reports of shortness of breath with or without exertion and as a result of her obesity, as well as obstructive sleep apnea. The ALJ appropriately explained that she accounted for these non-severe impairments in the residual functional capacity assessment, and substantial evidence supports her findings. (R. at 1158); *see* 20 C.F.R. §§ 404.1520, 416.920. Once Plaintiff meets the step two threshold with at least one impairment, the evidence for all alleged impairments, including medically determinable impairments that are not severe, will be considered at subsequent steps. *Id.* Here, the ALJ determined that the Plaintiff satisfied the severity requirement in step two as to other impairments, and later included asthma as a non-severe impairment when determining Plaintiff had the residual functional capacity to perform light work. (R. at 1147, 1150.) Accordingly, the undersigned finds that the ALJ properly considered Plaintiff's asthma, dyspnea on exertion, obesity, and shortness of breath.

> 3. *The ALJ Appropriately Considered Plaintiff's Subjective Complaints of Back and Hip Pain and Substantial Evidence Supports the ALJ's Residual Functional Capacity Finding Limiting Plaintiff to Light Work.*

Plaintiff next alleges the ALJ erroneously failed to account for Plaintiff's back and hip pain, either singly or in combination with Plaintiff's shortness of breath and obesity. (Pl.'s Mem. at 18-26.) In support, she cites medical records pertaining to Plaintiff's history of back pain radiating to her hip and leg, including objective imaging showing disc space narrowing, sclerosis, and osteophyte formation. (Pl.'s Mem. at 18, citing R. at 604, 632, 1393.) Plaintiff argues that the ALJ relied on "outdated" evidence by considering the September 2013 medical opinion of Dr. Surrusco because the evidence shows that Plaintiff's back pain worsened after that time. (Pl.'s Mem. at 19.) Plaintiff points to imaging from March 2019 which showed multilevel facet joint arthritis and "significant reduction of the L5-S1 disc space." (Pl.'s Mem. at 19, citing R. at 1399.)

Additionally, Plaintiff argues that her physicians noted the severity of her back condition, documented "markedly limited flexion[,] extension[,] and lateral flexion," and claims this is consistent with her complaints to providers rating her pain at 7/10 on multiple occasions. (Pl.'s Mem. at 19, citing R. at 1398-1402, 1434-35, 1439-40, 1442.) Moreover, Plaintiff argues that records from 2020 and 2021 documented decreased range of motion in her lower back and left hip, her request for injections to help with back pain, and her estimate of pain during one appointment as 10/10 in severity. (Pl.'s Mem. at 20-21, citing R. at 1460, 1478-81, 1537.) According to Plaintiff, "[i]t is inconceivable that with a record of back pain as fulsome as this, the ALJ crafted a [residual functional capacity] that focused almost entirely on [Plaintiff's] mental impairment." (Pl.'s Mem. at 20, citing R. at 1150.)

Defendant responds that the ALJ thoroughly considered the entire record and reasonably concluded that the evidence indicated Plaintiff's back and hip pain were not as severe or as limiting as Plaintiff alleged. (Def.'s Mem. at 26.) Defendant notes that the ALJ evaluated the objective evidence, which showed some abnormalities, but these "more often [were] not present." (Def.'s Mem. at 26, citing R. at 708, 1153.) Defendant argues that substantial evidence in the record supports the ALJ's findings, as numerous records documented normal or only slightly abnormal objective examination results and conservative treatment through primary care. (Def.'s Mem. at 26.) Defendant contends that "Plaintiff's response to the ALJ's analysis here is to selectively highlight her subjective reports of back pain and the few examination abnormalities. But that does not present error in the ALJ's analysis under the standard of review." (Def.'s Mem. at 27, citing Pl.'s Mem. at 19-21.)

The undersigned agrees with Defendant and finds that substantial evidence supports the ALJ's consideration of the evidence regarding Plaintiff's back and hip pain and the ALJ's

subsequent decision to limit Plaintiff to light work. First, the ALJ noted that Plaintiff's degenerative disc disease was a severe impairment because it "more than minimally affect[ed] [Plaintiff's] ability to perform basic work activities." (R. at 1147, citing R. at 20 C.F.R. §§ 404.1520(c) and 416.920(c).) The ALJ acknowledged that Plaintiff "long complained of back pain, and diagnostic imaging has shown multilevel degenerative changes and mild to moderate canal stenosis in the lumbar spine." (R. at 1152) (citations omitted.) Plaintiff "complain[ed] of persistent pain in her back that [ran] down to her hips, and at times, [her] clinician note[d] that she ha[d] tenderness in her back or hips, or a limited lumbar range of motion." (R. at 1152.) Further, the ALJ opined that Plaintiff:

> [D]emonstrated tenderness and a limited range of motion in the lumbar region, and she walked with a slow gait. Based on this and the findings on diagnostic imaging, she was advised to lose weight and consider breast reduction surgery. Since then, she has met with the orthopedist intermittently. Examinations remain largely unchanged, but once, she also displayed pain-limited strength in the right hip and knee.

(R. at 1152.) Subsequently, the ALJ concluded that "[t]he pain and other symptoms associated with [Plaintiff's] lumbar impairment limit her to work at the light exertional level." (R. at 1152.)

Although Plaintiff highlights medical records indicating her complaints to providers and objective evidence supporting her allegations, it is not the province of this Court to "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Indeed, a reviewing court affirms the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Importantly, "[a]n administrative decision is not

24

subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). Upon review, the undersigned finds that the ALJ cited to substantial evidence to support her finding that Plaintiff's back and hip pain limit her ability to work at the light level.

## C. The ALJ Was Not Required to Account for Plaintiff's Use of a Cane in the Residual Functional Capacity Assessment.

Plaintiff next alleges that the ALJ's residual functional capacity assessment failed to account for Plaintiff's use of a cane for ambulating and balance. (Pl.'s Mem. at 26.) In support, Plaintiff relies on her own testimony that she was prescribed a cane. (Pl.'s Mem. at 26.) She also cites to medical records that state, "Please give cane for gait stability ICD 10: R26.2, M54.5," where R26.2 is the diagnosis code for "difficulty walking, not elsewhere classified" and M54.4 indicates a low back pain diagnosis. (Pl.'s Mem. at 26.) Consequently, Plaintiff contends the ALJ erred in not dismissing Plaintiff's need for a cane on the basis that clinicians have only observed Plaintiff using the cane "on a few occasions and have never noted that [Plaintiff] appears off-balance or struggles to walk without the cane." (Pl.'s Mem. at 26.) Such evidence, according to Plaintiff, is insufficient to show that Plaintiff did not need a cane. (Pl's Mem. at 27.)

Defendant responds that the ALJ complied with the regulations when she decided not to include the use of an assistive device in the residual functional capacity assessment. (Def.'s Mem. at 29.) Specifically, Defendant claims that such a finding was reasonable because the record lacks an "unambiguous" statement "from a physician stating the circumstances in which an assistive device is medically necessary." (Def.'s Mem. at 29.) Defendant alleges that Plaintiff's request, not a physician's, prompted the cane prescription and that Plaintiff's medical records did not indicate that a cane was medically necessary. (Def.'s Mem. at 29.) Further, Defendant claims that Plaintiff's

treatment plan from her orthopedist never indicated the cane was necessary, and that when Plaintiff's gait was examined thereafter, Plaintiff was not observed using a cane. (Def.'s Mem. at 29-30.)

    *1.  Legal Standard.*

When determining a claimant's residual functional capacity, an ALJ must "consider the impact of 'medically required' hand-held assistive devices." *Fletcher v. Colvin*, No. 1:14CV380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015) (citing SSR 96–9p, 1996 WL 374185 (July 2, 1996)). For instance, use of a hand-held assistive device, such as a cane or walker, may limit a claimant's residual functional capacity "by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(J)(4). However, only devices that are "medically required" need to be considered by the ALJ when making the residual functional capacity assessment. *Fletcher*, 2015 WL 4506699, at *8 (quoting SSR 96-9p, 1996 WL 374185 (July 2, 1996)).

For an assistive device to be "medically required," the claimant must present medical documentation: (1) supporting her need for an assistive walking device; and (2) describing the circumstances that require it. SSR 96–9p, 1996 WL 374185, at *7. The description may note, for example, whether the device is required for a certain distance and terrain and whether the device is required all the time, periodically, or only in certain situations. *Id.* Neither a prescription for a cane, nor the lack thereof, necessarily determines whether the claimant medically requires an assistive device. *Fletcher*, 2015 WL 4506699, at *8 (citing *Staples v. Astrue*, 329 F. App'x 189, 191-92 (10th Cir. 2009)). The documentation must be from an approved medical source to establish the basis for the claimant's impairment and subsequent need for an assistive walking device. *Shari G. v. Kijakazi*, No. 3:20-VA-333, 2021 WL 4072659, at *6 (E.D. Va Sept. 7, 2021)

(citing 20 C.F.R. §§ 404.1513, 416.913). If the claimant fails to supply appropriate documentation, the ALJ need not include the use of an assistive walking device in the residual functional capacity assessment. *Fletcher*, 2015 WL 4506699, at *8.

   *2.  Evidence Related to Plaintiff's Use of a Cane.*

On September 25, 2019, Plaintiff met with Nurse Practitioner Jenea Bennett-Talley ("NP Bennett-Talley") regarding pain in her right leg and back. (R. at 1442.) A review of Plaintiff's symptoms revealed that she had "back pain, joint pain, right leg pain, [and] difficulty walking." (R. at 1444.) NP Bennett-Talley reported that Plaintiff's back pain was aggravated by "standing and walking for long periods of time." (R. at 1442.) In addition, she noted that "[Plaintiff] state[d] that she need[ed] a prescription for a cane, as she has been using her friend's [cane] to help her walk." (R. at 1442.)

A few weeks later, on October 11, 2019, Plaintiff met with an orthopedist, Niraj Kalore, M.D. ("Dr. Kalore") regarding her lower back pain. (R. at 1435.) Dr. Kalore noted that Plaintiff "reports difficulty standing and putting weight on the right lower extremity for [a] long time[.] [S]he has to sit down if she does this." (R. at 1435.) The record for that appointment included a "Prescriptions & Documented Meds by [History]" section where Dr. Kalore wrote the following: "non-formulary medication (Please give cane for gait stability ICD 10: R26.2, M54.5)*(Rx):* 1 ea[ch] " (R. at 1436-37.) Plaintiff's musculoskeletal evaluation indicates that she "walk[ed] slowly", "[was] able to heel walk and toe walk," and otherwise had "normal motor strength in both lower extremities." (R. at 1440.) However, Dr. Kalore's diagnosis and plan for Plaintiff did not refer to a cane or specify its use. (R. at 1440-41.)

On January 16, 2020, Plaintiff visited Carlos Williams, M.D. ("Dr. Williams") for a follow-up appointment regarding her sleep apnea. (R. at 1411.) Plaintiff's physical examination indicated

that she had a "normal range of motion, normal strength, [and] normal gait." (R. at 1414.) The record for that appointment also included a "Prescriptions & Documented Meds by [History]" section where Dr. Williams noted, "non-formulary medication (Please give cane for gait stability ICD 10: R26.2, M54.5)*(Rx)*: 1 ea[ch] *[Still taking, as prescribed]*." (R. at 1413.)

On January 20, 2020, Plaintiff treated with Nurse Practitioner Alyssa Milam ("NP Milam") complaining of left hip pain "for some months now and a nodule inside her [left] thigh area about the same time." (R. at 1536.) The pain "radiat[ed] down her leg, and [was] rated as a 8/10." (R. at 1536.) Despite her "[j]oint pain, [l]imitation of joint movement, [and] [m]uscle pain," the record stated that Plaintiff had a normal gait. (R. at 1537.) Finally, NP Milam "discussed [the] expected course of back pain," including treatment options, and recommended that Plaintiff "maintain or resume normal activities . . . within appropriate limits" and recommended "stretching exercises and use of cooling to painful areas." (R. at 1538.) NP Milam did not provide further indication regarding the use of a cane or other assistive walking device. (R. at 1538.)

Plaintiff returned to NP Bennett-Talley on July 9, 2020, and August 12, 2020, due to back pain, pain in her right foot, and swelling in her ankle and foot. (R. at 1473, 1478.) Medical records from both visits contained the same note advising: "Please give cane for gait stability." (R. at 1475, 1480.) In addition, physical examination notes from July 2020 stated, "[range of motion] decreased; use cane," and the August 2020 physical examination noted, "right ankle swelling +2; decreased [range of motion]; pain upon palpitation." (R. at. 1476, 1481.) Plaintiff's treatment plan, however, did not specify use of a cane. (R. at 1476, 1481.)

Plaintiff had subsequent visits to various doctors in May, July, and October 2021. Medical records from those visits reflect that Plaintiff had "normal [range of motion], normal strength,"

and her gait was described as "normal" and "within normal limits." (R. at 1586, 1629, 1650, 1973.)

During the administrative hearing on February 15, 2022, Plaintiff testified that she started using the cane sometime in 2021 and attested that it was prescribed by a doctor. (R. at 1189.) She explained that she could only stand for "maybe five or ten minutes" and that she "ha[d] to use [her] cane a lot" for ambulation and balance "because without it . . . [she] will fall" (R. at 1189.) Plaintiff attested to using the cane "every day" both inside and outside of the house. (R. at 1196.) Without the cane, Plaintiff stated that she "can walk a little bit . . . but [she] cannot walk no [sic] long distance. . . only just a teeny bit." (R. at 1196.) Plaintiff elaborated that she moved about her home by holding onto doors, but she "ha[d] [her] cane . . . with [her] in case [she] . . . can't get up." (R. at 1196.)

### 3. *The ALJ's Evaluation of Plaintiff's Need for a Cane.*

In her opinion, the ALJ found that Plaintiff's subjective complaints of pain and need for a cane were "not as severe or as limiting as she claim[ed]." (R. at 1153.) Specifically, the ALJ noted that "clinicians have observed [Plaintiff] use [a cane] on only a few occasions and have never noted that she appears off balance or struggles to walk without it." (R. at 1153.)

Plaintiff finds error in the ALJ's conclusion and cites to her own testimony that she needs a cane. (Pl.'s Mem. at 26.) However, such evidence is insufficient, as a claimant's testimony does not inform an ALJ's determination about whether an assistive device is "medically required." *Shari G. v. Kijakazi*, No. 3:20-VA-333, 2021 WL 4072659, at *6 (E.D. Va Sept. 7, 2021) (citing 20 C.F.R. §§ 404.1513, 416.913). Instead, the claimant must present the ALJ with medical documentation from an approved medical source. *See id.* Indeed, "self-reports . . . are not sufficient . . . ." *Johnson v. Berryhill*, 2017 WL 722063, at *9 (W.D. Va. Feb. 23, 2017). Accordingly, the ALJ was not obligated to accept Plaintiff's testimony as dispositive on the issue as to whether a

cane was medically necessary under the governing regulations.

Plaintiff also cites to the aforementioned medical records that note her cane use, difficulty walking, and lower back pain. (Pl.'s Mem. at 26.) But these records fall short of proving that a cane is "medically required" because, although they acknowledge that Plaintiff used a cane on occasion, they fail to describe when or why the cane is medically necessary. While the records may arguably "support [her] need for an assistive walking device," they do not "describe the circumstances that require it." *See* SSR 96–9p, 1996 WL 374185, at *7. Indeed, references in the record from physicians that a claimant presented with an assistive device are insufficient; there must be "an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary." *Johnson v. Berryhill*, 2017 WL 722063, at *9 (W.D. Va. Feb. 23, 2017) (quoting *Tripp v. Astrue*, 498 Fed. App'x 951, 955 (7th Cir. 2012)); *see also Staples v. Astrue*, 329 Fed. App'x, 189, 192 (10th Cir. 2009) (finding that a doctor's statement that the plaintiff used a cane did not suffice to establish medical necessity). Moreover, prescriptions for an assistive walking device are not conclusive in an ALJ's evaluation of an assistive device's medical necessity. *See Fletcher*, 2015 WL 4506699, at *8. Though Plaintiff identified evidence in the record in which her providers prescribed her a cane, this is insufficient for her to meet her burden of proving that a cane was medically necessary pursuant to the regulations. *See Arakas v. Comm'r, Soc. Sec. Admin*, 983 F.3d 83, 95 (4th Cir. 2020). Because the record lacks unambiguous evidence describing the circumstances where Plaintiff requires the use of a cane, the ALJ was not required to include the use of an assistive walking device in her residual functional capacity assessment.

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) and Motion to Remand (ECF No. 14) be DENIED, that Defendant's

Motion for Summary Judgment (ECF No. 18) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge David J. Novak and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/ MRC
_____
Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: August 9, 2023